# Illinois Official Reports

## Appellate Court

<div style="border">

### *People v. Flunder*, 2019 IL App (1st) 171635

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TELLY FLUNDER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-1635 |
| Filed<br>Rehearing denied | December 26, 2019<br>January 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-16797; the Hon. Thomas M. Davy and the Hon. William Raines, Judges, presiding. |
| Judgment | Reversed and remanded |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel, and Armando Medina Jr., law student), for the People. |

Panel            PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     After a bench trial, defendant Telly Flunder, age 43, was convicted of unlawful use of a weapon by a felon and sentenced to six years in the Illinois Department of Corrections (IDOC).

¶ 2     The trial court granted defendant's motion to suppress the gun and then reconsidered and denied the motion. On appeal, defendant argues that the trial court's first decision was correct, while the State asks us to affirm the court's second and final decision. The State argues that the encounter at issue was not an investigative or *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)), but rather a voluntary and consensual police-citizen encounter, and that, during this voluntary encounter, the officer developed a fear for his safety that justified a frisk. Instead of the familiar stop-and-frisk, the State argues that this was a voluntary-encounter-and-frisk. In response, defendant contends that there is no such thing. Defendant argues that, if there was no legal basis for an investigative or *Terry* stop, then three was no legal basis for a frisk either.

¶ 3     For the following reasons, we reverse and remand for further proceedings.

¶ 4                                     BACKGROUND

¶ 5     At the pretrial suppression hearing, the defense called Officer David Bachlar, who testified that, on September 21, 2015, at 1:15 in the afternoon, he and his partner were in plain clothes and driving an unmarked vehicle down Racine Avenue in Chicago, when they observed defendant standing next to a vehicle at a gas station. The vehicle was by a gas pump, and defendant was standing by the driver's side, which was the side away from the pump. The officers "pulled up and asked him his business" at the gas station and asked if the vehicle belonged to him. Defendant replied that the vehicle belonged to his cousin, and Officer Bachlar asked if he had a driver's license. During this conversation, defendant "began to move around, fidget with his clothes; and at one point he bent out of sight" of the officers. Defendant's vehicle was located between defendant and the officers,[1] such that they could not observe defendant when he bent down. Prior to bending down, defendant had reached toward his pockets.

¶ 6     Bachlar testified that, "[d]ue to the safety issue," he walked around to defendant's side of the vehicle and performed a protective patdown of defendant. During the patdown, Bachlar felt what he believed to be a gun in defendant's pants pocket and asked defendant what it was. Defendant replied that it was "a little pea shooter." Bachlar understood from that statement that the object was a gun. Bachlar then reached into defendant's pocket and retrieved a gun that was two inches by four inches in size. The .38 caliber gun held two bullets.

¶ 7     On cross, Bachlar testified that he was on patrol in that area because "a lot of people" had been shot there within the last couple of weeks. After Bachlar asked defendant if he had a

---

[1]Bachlar did not state when, during the encounter, he exited his vehicle or where his vehicle was parked in relation to defendant's vehicle.

driver's license, defendant appeared "very nervous." After Bachlar recovered the gun, defendant did not provide a Firearm Owners Identification (FOID) card or a concealed carry license. Bachlar frisked defendant out of "fear for [his] safety."

¶ 8   On redirect, Bachlar admitted that, in both the arrest report and the case incident report that he prepared, he did not state either that defendant was moving around a lot or that defendant appeared nervous. Bachlar also admitted that he had no information that defendant or his vehicle was involved in any recent shootings.

¶ 9   Bachlar was the only witness at the suppression hearing. At its conclusion, the defense argued that the police officers had no reasonable suspicion to believe that defendant was doing anything wrong when he was standing next to a vehicle at a gas pump in the middle of the afternoon. In response, the State argued that this was not a *Terry* stop, but a voluntary police-citizen encounter, during which Officer Bachlar became fearful for his safety and conducted a frisk. The State argued that the officer reasonably feared for his safety due to the reports of shootings in the area and the fact that defendant bent out of sight of the officers, as though he was trying to conceal something.

¶ 10   After listening to the evidence and arguments, the trial court found that, when defendant "duck[ed] down," if the officer "could not specifically articulate that it was a weapon," then the officer "went beyond" what the case law allowed, and the trial court granted defendant's motion to suppress the gun.

¶ 11   On March 22, 2016, the State filed a motion to reconsider, citing the same cases that the prosecutor had cited during the suppression hearing. On April 19, 2016, the trial court heard argument on the State's motion and granted it, stating

> "I believe that I was in error on February 17th based on the actions of the [d]efendant, specifically, the fact that he was bent over and that his vehicle was between himself and the officers, that Officer [Bachlar] would have been justified in a limited pat down, which was what was done, a protective pat down."

The court vacated its prior ruling of February 17, 2016, and denied defendant's motion to quash arrest and suppress evidence. On November 10, 2016, the defense filed a motion to reconsider, which was denied.

¶ 12   At the bench trial held on April 18, 2017, Officer Bachlar was again the only witness, and his testimony on direct examination was substantially consistent with his prior testimony at the suppression hearing. In addition to what he already testified to at the suppression hearing, Bachlar testified that the conversation he had with defendant lasted only 15 seconds before he patted defendant down. After being taken into custody but while still at the scene, defendant stated that he had obtained the gun from his uncle's shop and was taking it home.

¶ 13   On cross-examination, Bachlar testified that he did not recall whether there was a gas-pump hose inside defendant's gas tank or whether a gas container was being filled at the pump. Drawing on a photo of the gas station, Bachlar clarified that the police vehicle was to the left of the pump, defendant's vehicle was to the right of the pump, and defendant was standing on the side of his vehicle away from the pump. When Bachlar asked defendant if he had identification, Bachlar did not recall what defendant said in response. Bachlar also did not recall whether he told defendant to raise his hands or place them on his vehicle. However, defendant did comply with all the officer's orders and made no attempt to flee.

- 3 -

¶ 14    The State waived its initial closing argument and reserved rebuttal. In closing, defense counsel observed that the trial judge was not the same judge who had presided over the suppression hearing, and counsel argued that defendant could raise the fourth amendment claim again and was doing so. In response, the State argued that defendant's "ducking down behind a car where the officer could not see him" caused the officer to be reasonably "in fear for his safety."

¶ 15    With respect to the fourth amendment issue, the trial court found that "the officer was within his powers to stop and frisk the defendant based on his observations." The trial court found the officer "credible" and found defendant guilty.

¶ 16    On June 13, 2017, the trial court denied defendant's posttrial motion for a new trial, which included the fourth amendment issue. In mitigation, defense counsel observed that defendant, who was 43[2] years old, had remained "crime free for the past 16 years." After considering factors in both mitigation and aggravation, the trial court sentenced defendant to the minimum, which was six years with IDOC. A timely notice of appeal was filed on June 13, 2017, and this appeal followed.

¶ 17                                    ANALYSIS

¶ 18    On appeal, defendant argues that the trial court erred by failing to grant his motion to quash his arrest and suppress the gun seized from him.

¶ 19                              I. Standard of Review

¶ 20    A trial court's ruling on a defendant's motion to suppress evidence and quash arrest usually involves questions of both fact and law. *People v. Williams*, 2016 IL App (1st) 132615, ¶ 32; *People v. McCarty*, 223 Ill. 2d 109, 148 (2006).

¶ 21    A trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence. *People v. Holmes*, 2017 IL 120407, ¶ 9; *Williams*, 2016 IL App (1st) 132615, ¶ 32; *People v. Close*, 238 Ill. 2d 497, 504 (2010). At a hearing on a motion to suppress evidence and quash arrest, the trial court acts as the factfinder and, as such, is responsible for determining the credibility of the witnesses, drawing reasonable inferences from the testimony and other evidence, and weighing the evidence presented. *Williams*, 2016 IL App (1st) 132615, ¶ 32; *Close*, 238 Ill. 2d at 504. In the case at bar, there was little dispute about the events, since only one witness testified at both the suppression hearing and the bench trial, and that was the officer.

¶ 22    The trial court's ultimate ruling on the motion is a question of law that we review *de novo*. *Holmes*, 2017 IL 120407, ¶ 9; *Williams*, 2016 IL App (1st) 132615, ¶ 32; *Close*, 238 Ill. 2d at 504. Thus, "[a] reviewing court *** [is] free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions." *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 72; see also *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). *De novo* consideration means that a reviewing court performs the same analysis that a trial court would perform. *People v. Stephens*, 2017 IL App (1st) 151631, ¶ 48.

---

[2]Defense counsel stated that defendant was 44 years old, but the presentence report indicated that he was 43.

¶ 23                                    II. Fourth Amendment

¶ 24        Both the Illinois Constitution and the fourth amendment of the United States Constitution protect citizens from unreasonable searches and seizures by police officers. *Holmes*, 2017 IL 120407, ¶ 25; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "[T]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials," such as police officers. *People v. Jones*, 215 Ill. 2d 261, 269 (2005).

¶ 25        Encounters between police officers and citizens have been divided by the courts into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as "*Terry* stops," which must be supported by a police officer's reasonable, articulable suspicion of criminal activity; and (3) consensual encounters that involve no coercion by the police and, thus, do not implicate the fourth amendment. *Williams*, 2016 IL App (1st) 132615, ¶ 34; *Ciborowski*, 2016 IL App (1st) 143352, ¶ 77; see also *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006).

¶ 26        Pursuant to the landmark case of *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may conduct a brief, investigatory detention when he or she has a reasonable suspicion that a person is committing, is about to commit, or has committed a criminal offense. *Williams*, 2016 IL App (1st) 132615, ¶ 44; *Ciborowski*, 2016 IL App (1st) 143352, ¶ 77. The officer's reasonable suspicion must be more than a hunch and must be supported by specific and articulable facts. *Williams*, 2016 IL App (1st) 132615, ¶¶ 44-45. When reviewing the officer's action, a court will apply an objective standard, rather than a subjective standard. *People v. Colyar*, 2013 IL 111835, ¶ 40. Thus, the question on review is whether the facts known to the officer at the time would lead a reasonably prudent person in the same circumstances to believe that the action was appropriate. *Colyar*, 2013 IL 111835, ¶ 40.

¶ 27        After making a lawful stop, a police officer may perform a frisk or protective patdown search if he or she has a reasonable, articulable suspicion that the person stopped is presently armed and dangerous. *People v. Surles*, 2011 IL App (1st) 100068, ¶ 35. "[P]resently armed" is not enough, particularly since one now has the right to carry concealed arms if one has a concealed carry card. 430 ILCS 66/10(a) (West 2016).[3] The officer must also reasonably believe that the person is presently dangerous. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001).

¶ 28        The case at bar presents two competing concerns. On the one hand, it cannot be the case that officers can approach any African American male and ask for his driver's license because there were shootings in the area during the prior two weeks when the officers do not have any particularized suspicion about him. Otherwise, in addition to "Driving While Black," we will have "pumping gas while black." *E.g.*, David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544 (1997). On the other hand, the State argues that police are allowed to engage

---

[3]Section 10 of the Firearm Concealed Carry Act (430 ILCS 66/10 (West 2016)) was amended effective July 10, 2015, which is before September 21, 2015, the date of this offense. That is why this opinion cites the 2016 version of the Illinois Compiled Statutes, rather than the 2014 version. However, the amendment did not affect the point for which this section is cited.

in voluntary, consensual encounters, and if they become reasonably fearful for their safety during such an encounter,[4] they should be able to do a protective patdown.

¶ 29 As an Illinois Supreme Court justice observed, it is "actually a hotly contested issue in the federal courts," whether the police may engage in a protective weapons search for their own safety during a voluntary encounter and without reasonable suspicion. *Colyar*, 2013 IL 111835, ¶ 71 (Thomas, J., specially concurring). The Fourth and Eighth Circuits have found that a frisk requires a reasonable suspicion of criminal activity, while the First, Ninth and Eleventh Circuits have held the opposite. *Colyar*, 2013 IL 111835, ¶ 71 (Thomas, J., specially concurring); 4 Wayne R. LaFave, Search and Seizure § 9.6(a), at 841 n.13 (5th ed. 2012) (discussing the conflict).

¶ 30 First, this court has previously rejected the State's position in a case that is factually similar to the case at bar, and the State does not ask us to abandon our existing precedent. *People v. F.J.*, 315 Ill. App. 3d 1053, 1059-60 (2000) (a frisk presupposes the right to make a stop). Even though *F.J.* was discussed in defendant's opening brief, the State's responsive brief does not discuss or cite the case.

¶ 31 In *F.J.*, the only witness at the suppression hearing was the police officer who made the arrest, as in our case. *F.J.*, 315 Ill. App. 3d at 1055. In *F.J.*, the police officer testified that there had been "a gang disturbance reported in the area a couple minutes previously," making the case for a frisk stronger in *F.J.* than in our case. *F.J.*, 315 Ill. App. 3d at 1055. After observing F.J. standing by an alley, the officer stopped and exited his vehicle. *F.J.*, 315 Ill. App. 3d at 1055. Similarly, in the case at bar, after observing defendant standing by a gas pump, the officer stopped and exited his vehicle. In *F.J.*, the officer observed F.J. glance at him and secrete an object in his pocket. *F.J.*, 315 Ill. App. 3d at 1055. Similarly, in the case at bar, after the officer stopped and exited his vehicle and began conversing with defendant, defendant fidgeted with his clothes and bent down out of the officer's view. In, *F.J.*, as in our case, the officer immediately performed a frisk, recovered a gun, and placed the defendant in custody. *F.J.*, 315 Ill. App. 3d at 1055. Similar to what ultimately happened in the case at bar, the trial court in *F.J.* found the officer credible and denied the defendant's motion to quash arrest and suppress the gun. *F.J.*, 315 Ill. App. 3d at 1055.

¶ 32 In *F.J.*, this court found that the officer lacked the reasonable suspicion needed for a *Terry* stop, where there was nothing "unusual about people walking around outside at 10 p.m.," where one's presence in a high crime area is not sufficient by itself to justify a stop, where F.J. was standing and not running,[5] and where secreting something in one's pocket is subject to many innocent explanations. *F.J.*, 315 Ill. App. 3d at 1057.

¶ 33 In *F.J.*, "[t]he State argue[d] that, even if there was not a sufficient basis for a *Terry* stop, the handgun need not be suppressed, because there was no stop, only a frisk. According to the State, regardless of whether there were grounds for a stop, a frisk was justified." *F.J.*, 315 Ill. App. 3d at 1059. The State makes the same argument in the case at bar. In *F.J.*, this court stated unambiguously: "We disagree." *F.J.*, 315 Ill. App. 3d at 1059.

---

[4]There is also a real question whether the police in this case could be said to have been engaged in even a voluntary encounter prior to the patdown, when the entire pre-patdown conversation lasted only 15 seconds.

[5]"Headlong flight—wherever it occurs—is the consummate act of evasion ***." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

¶ 34    This court found that an officer may conduct a protective search only if he has reason to believe that the suspect is armed and dangerous "*and*" if he is entitled to make a stop. (Emphasis in original.) *F.J.*, 315 Ill. App. 3d at 1059. We explained:

> "The reason a frisk presupposes the right to make a stop is that, as Justice Harlan pointed out in his *Terry* concurrence, if 'a policeman has a right *** to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence.' " *F.J.*, 315 Ill. App. 3d at 1059 (quoting *Terry*, 392 U.S. at 32 (Harlan, J., concurring)).

Further, we explained:

> " '[I]f an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion that he is armed; in such a case the officer may protect himself by not engaging in the confrontation.' " *F.J.*, 315 Ill. App. 3d at 1060 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 247-49 (3d ed. 1996)).

Pursuant to *F.J.*, 315 Ill. App. 3d at 1060, the officer in the case at bar could have protected himself by not walking around the vehicle to engage in a confrontation.

¶ 35    Although *F.J.* is dispositive of the case at bar, the State makes no argument that we should abandon it. See *In re Mario T.*, 376 Ill. App. 3d 468, 473 (2007) (this court found that "what started as a consensual encounter was converted into a 'stop and frisk' " when the officer started to do a patdown); see also *In re Mario T.*, 376 Ill. App. at 471 ("Once [the officer] began the protective pat-down, it changed the fundamental nature of the encounter from a consensual one into a full-blown *Terry* stop."); *People v. Wells*, 403 Ill. App. 3d 849, 857 (2010) (where the officers almost immediately handcuffed and patted down defendant, their actions required both reasonable suspicion for the stop and "an additional quantum of suspicion or cause" for the search).

¶ 36    Second, defendant states in his reply brief to this court that he is not challenging "the finding that Officer Bachlar was in fear for his safety." However, the issue is whether this fear was reasonable, and we find that it was not, based on the facts known to the officer at the time. The officer testified that he had just asked defendant for his driver's license. It is stating the obvious to observe that a lot of men keep their driver's license in their pants pocket. As one would expect, defendant was reaching toward his pants pocket.[6] The officer also testified that defendant appeared nervous. However, the average person would be surprised to be parked at a gas station in the middle of the afternoon and be asked what their "business" was at a gas pump. There was no testimony that the officers identified themselves as police officers, and the officer testified that they were neither in uniform nor in a marked police vehicle. That alone would make any responsible person nervous.

¶ 37    When the police initially questioned defendant, defendant's vehicle was between the police officers who were on one side of it and defendant who was on the other side. Although the officer testified that he feared for his safety when defendant bent down, the officer walked around defendant's vehicle in order to move closer to defendant. See *F.J.*, 315 Ill. App. 3d at 1059-60 (for an officer to have the right to disarm an individual, the officer must first have the

---

[6]"Putting something in one's pocket is subject to many plausible innocent explanations." *F.J.*, 315 Ill. App. 3d at 1058; *People v. Smith*, 331 Ill. App. 3d 1049, 1055 (2002) ("Certainly, putting something in one's pocket is not a hallmark of criminal activity.").

right to not have to avoid him). After walking around the vehicle, the officer was standing directly in front of defendant; however, he did not testify that he drew his weapon, and he did not recall whether he asked defendant to place his hands in the air or on the vehicle. There was no testimony that defendant continued to fidget or reach toward his pocket once the officer had walked around the vehicle and toward defendant. Defendant did not run or attempt to flee but stood there.

¶ 38     After the officer walked around the vehicle, he immediately performed a patdown search and felt what appeared to be a gun. When asked what was in his pocket, defendant responded honestly that he had a "pea-shooter," which the officer understood to be a gun. It is legal to both have a gun and to carry a concealed gun if one has a FOID card and a concealed carry card. However, the officer did not ask defendant if he had either card before further frisking him to retrieve the gun. See 430 ILCS 66/10(h) (West 2016) (a licensee must disclose whether he or she is in possession of a concealed firearm if an officer asks about it); *People v. Aguilar*, 2013 IL 112116, ¶ 19 (a flat-out ban on carrying ready-to-use guns outside the home is unconstitutional).

¶ 39     We cannot find that the officer's fear was reasonable on the facts of this case, where, as far as the officer knew, this was a random person at a gas pump on a weekday afternoon, where he answered the officer's questions, where he did not try to flee, where he reached for his pocket as the officer asked for his driver's license, where there was no testimony that defendant reached for his pocket after the officer walked toward him, where the entire conversation prior to the patdown lasted only 15 seconds, where defendant honestly admitted possession of a gun, and where the officer did not ask him if he possessed a FOID or concealed carry card prior to the frisk.

¶ 40     Suppression may seem like a drastic remedy in a case like this where a gun was actually found. However, we do not know how many men, if any, were stopped before one was found with a gun because only the ones who are charged move to suppress. The fourth amendment is a blunt-edged sword, but it protects the privacy of us all, both the ones with contraband and the ones without it.

¶ 41                                III. Double Jeopardy

¶ 42     We must now consider the proper remedy. "Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 21.

¶ 43     "The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings ***." *Drake*, 2019 IL 123734, ¶ 20. Retrial is barred only "if the evidence introduced at the initial trial was insufficient to sustain the conviction." *Drake*, 2019 IL 123734, ¶ 20. " '[F]or purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence.' " *Drake*, 2019 IL 123734, ¶ 20 (quoting *People v. Olivera*, 164 Ill. 2d 382, 393 (1995)). To determine the sufficiency of the evidence, a reviewing court views the evidence in the light most favorable to the prosecution and considers whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Drake*, 2019 IL 123734, ¶ 21. In the case at bar, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based on the certified copy of conviction for

the prior offense and the seizure of the gun from defendant's person. Thus, remanding for further proceedings is the proper remedy in this case.

¶ 44 Finally, we observe that defendant also argues that his arrest was illegal because the officer failed to ask him for a FOID or concealed carry card prior to taking him into custody. Unfortunately for defendant, the testimony is not crystal clear on this point. At the suppression hearing, the officer testified that, "after" he recovered the gun, defendant did not "provide" a FOID or concealed carry card. At the bench trial, the officer was asked if defendant "was able to produce" a FOID or concealed carry card. However, this question did not indicate if the failure to produce occurred before or after the arrest. The next question asked if defendant was "placed into custody." The State would like us to read an "after" clause into this question—as in, "after defendant failed to produce a FOID or concealed carry card, was he placed into custody?" But that is simply not what the transcript states.

¶ 45 However, there is no need for us to reach this second issue, since we reverse on the first issue.

¶ 46                                                    CONCLUSION

¶ 47 For the foregoing reasons, we find that the gun should have been suppressed. We reverse defendant's conviction and remand for further proceedings consistent with this opinion.

¶ 48 Reversed and remanded for further proceedings.